# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Lake Dearborn, LLC, et al.[1] | ) Case No. 13-36813 |
| | ) Jointly Administered |
| Debtors. | ) Hon. Jacqueline P. Cox |

## Memorandum Decision

This matter came before the Court at evidentiary hearings conducted on May 27, 28 and 29, 2015, on the objection of Garvey Court, LLC and its affiliates[2] ("Garvey Court") to the claims for rejection damages filed by Byeung Hean Lee d/b/a Green Apple Grill & More ("Green Apple Grill"); Hwani, Inc., d/b/a K-Kitchen ("K-Kitchen"); Luna Hospitality, Inc. f/k/a R.O.C. Hospitality Group, d/b/a Pueblo ("Pueblo"); Noorul Amin Khowaja/E-Doing, Inc. d/b/a Dunkin Donuts ("Dunkin Donuts"); Seedays (Illinois), LLC ("Seedays"); Shahaamir, Inc., d/b/a Wing Kingz ("Wing Kingz"); Windy City's Finest, Inc., d/b/a Robinson's #1 Ribs Store 3 ("Robinson's Ribs"); The Works North Loop, Inc. ("The Works"); and Latanya Winfield d/b/a Harold's Chicken Shack #84 ("Harold's Chicken") (collectively, "Rejection Claimants"). The Court has considered the Proofs of Claim filed by the Rejection Claimants, the Objections filed by Garvey Court, the testimony of the witnesses, the admitted evidence, other motions and documents filed on the docket in this case, and the arguments of counsel. Based on the foregoing, and for the reasons set forth below, the Court has determined the allowed amount of rejection damages for each Rejection Claimant in separate Orders.

---

[1] The debtors in these chapter 11 cases included: Lake Dearborn, LLC; Dearborn Residential, LLC; Dearborn Retail, LLC; DR Dearborn Investment, LLC; 800 South Wells Phase II, LLC; La Salle Commercial, LLC, all of which filed on August 19, 2013; and Invsco Employee Services, Inc., which filed on August 28, 2013 (collectively, the "Debtors").

[2] Garvey Court Holdings, LLC, Bighorn Capital, Inc. and their various affiliates have submitted themselves to the jurisdiction of this Court.

## I. Jurisdiction and Venue

This Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. §§ 157 and 1334. Under 28 U.S.C. § 1334(a), the federal district courts have original and exclusive jurisdiction of all cases under the Bankruptcy Code. 28 U.S.C § 157(a) allows the district courts to refer these cases to the bankruptcy judges for their districts. The District Court for the Northern District of Illinois has promulgated Internal Operating Procedure 15(a), which refers its bankruptcy cases to this Court. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. Facts and Background

As of the petition date, August 19, 2013, Dearborn Retail, LLC ("Dearborn Retail") owned the real property constituting the food court space located at 201 N. Clark St., Chicago, Illinois (the "Food Court"). On March 26, 2014, Dearborn Retail and other related entities (collectively, the "Dearborn Entities") entered into a commitment letter with Bighorn Capital, Inc. ("Bighorn") which provided, *inter alia*, for the contribution of the Dearborn Entities' assets to a joint venture under which Garvey Court, LLC, an entity controlled by Bighorn, would acquire the real property constituting the Food Court (the "Bighorn Transaction"). In connection with the Bighorn Transaction, on May 12, 2014, Dearborn Retail filed a motion to reject eighteen unexpired Food Court leases under which it was the landlord (the "Rejected Leases").

On May 15, 2014, the Court entered an order authorizing the rejection of Rejected Leases ("Rejection Order"). (See dkt. no. 195.) Pursuant to the Rejection Order, Garvey Court was "obligated for all of the obligations, if any, to pay any damages and/or termination fees that result from the rejection of the Leases (collectively, the "Rejection Damages")." Per the terms of the Rejection Order, the effective date of the rejections would be the date of the entry of an order granting the motion to dismiss the bankruptcy cases of Dearborn Retail and certain other related

debtors (i.e., June 3, 2014, see dkt. no. 200), and when the Bighorn Transaction was completed and transfer of ownership of the Food Court to Garvey Court was completed (i.e., June 4, 2014). Therefore, the effective date of the lease rejections is June 4, 2014 (the "Rejection Date"). After the Rejected Date, several of the tenants under the Rejected Leases remained in possession of their leased premises ("Holdover Rejected Tenants"), some of whom continued to occupy the premises without paying rent. On September 3, 2014, the Court closed the Chapter 11 cases of Dearborn Retail and the other dismissed Debtors.[3]

On April 1, 2015, the Court entered an Order granting the Holdover Rejected Tenants' Motion to Reopen Chapter 11 Case of Dearborn Retail, LLC, Case No. 13-36887, for the limited purpose of liquidating rejection damages claims resulting from the rejection of the leases against Garvey Court.[4] On April 13, 2015, the Court entered the Order Granting Motion For Approval of Rejection Claims Resolution Procedure ("Claims Resolution Order"), which required each Holdover Rejected Tenant to file a proof of claim for rejection damages and set forth the terms under which they could remain in possession of their leasehold interest in the Food Court while the parties attempted to resolve or otherwise settle the claims.

The Holdover Rejected Tenants were given until May 1, 2015 to file a proof of claim for Rejection Damages or a notice of possessory rights pursuant to 11 U.S.C. § 365(h)(1)(A)(ii). If the parties could not resolve or otherwise settle the rejection claims, Garvey Court had until May 13, 2015 to file and serve an objection to the allowance of such unresolved rejection claim(s); otherwise, such rejection claims would be allowed as filed. The Claims Resolution Order also provided that an evidentiary hearing, if necessary, would be scheduled to determine the amount of damages to be awarded on each unresolved rejection claim.

Nine of the eighteen tenants whose leases had been rejected ("Rejection Claimant(s)") filed timely proofs of claim which were not resolved or settled within the prescribed period

---

[3] All of the Debtors, except 800 South Wells Phase II, LLC, were dismissed on June 3, 2014 after securing exit financing.

[4] All claims, pleadings and other filings in the reopened Dearborn Retail, LLC case, Case No. 13-36887, were ordered to be filed in the jointly administered case, Case No. 13-36813.

("Rejection Claim(s)"). On May 13, 2015, Garvey Court filed its objections to the Rejection Claims. The Court held evidentiary hearings over three days later that month to determine the Rejection Claimants' actual damages resulting from the rejection of the leases.[5]

## III. Discussion

Section 365(a) of the Bankruptcy Code provides that, subject to court approval, a trustee may "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). This provision "[a]llows a trustee or debtor in possession to accept the benefits of an advantageous contract by assuming it or to be relieved of the obligations of a burdensome contract by rejecting it." *In re Fitch*, 174 B.R. 96, 100 (Bankr. S.D. Ill. 1994). *See also In The Matter of Midway Airlines*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 thus advances one of the Code's central purposes, the maximization of the bankruptcy estate for the benefit of creditors.").

"Generally, while a debtor may use a bankruptcy case to get out from under an unfavorable lease where the debtor is the lessee, where the debtor is the lessor he is often stuck with the tenant. While the lease may be rejected, rejection does not effect its cancellation, and no Bankruptcy Code provision empowers a debtor-lessor or its trustee to avoid or strip off an unwanted lease." *In re Scharp*, 463 B.R. 123, 129 (Bankr. C.D. Ill. 2011). "Under Section 365(h), once a lease under which the debtor is the lessor is rejected, the tenant has a choice. The tenant may treat the lease as terminated, vacate the premises without liability for future rent, and may assert an unsecured claim for damages resulting from the lessor's breach." 11 U.S.C. § 365(h)(1)(A)(i); *In re Scharp*, 463 B.R. at 129, citing *In re Milstead*, 197 B.R. 33, 35 (Bankr. E.D.Va. 1996). Alternatively, the tenant may retain possession of the property if he wants to do so. 11 U.S.C. § 365(h)(1)(A)(ii). Rejection of a lease does not cancel or terminate it, but merely

---

[5] Latanya Winfield d/b/a Harold's Chicken Shack #84 settled with Garvey Court prior to the scheduled evidentiary hearing, did not appear before the Court to pursue her case, and withdrew her Proof of Claim on June 16, 2015.

-4-

removes it from property of the estate. *In re Miller*, 282 F.3d 874, 878 (6th Cir. 2002); *In re Rosenfeld*, 23 F.3d 833, 839 (4th Cir. 1994).

Under 11 U.S.C. § 365(g), the Debtor's rejection of the unexpired leases constituted a breach of the lease that is deemed to have occurred prepetition. A party may generally recover from a person breaching a contract:

> such damages as may be fairly and reasonably be considered as naturally arising from the breach thereof, in light of the facts known or which should have been known, or such as may reasonably be supposed to have been within the contemplation of the parties as a probable result of a breach thereof.

*Jones v. Melrose Park Nat'l Bank*, 228 Ill. App. 3d 249, 592 N.E.2d 562, 569, 170 Ill. Dec. 126 (Ill. App. Ct. 1992). "Speculative damages or damages not the proximate result of a breach of contract will not be allowed." *Id.*

Generally, the Rejection Claimants argued that the damages resulting from rejection of their leases should include relocation damages, based on actual proposals and vendor estimates, consisting of the following: (1) full build-out costs of and equipment relocation to a new location; (2) replacement rent for the balance of the original lease term; and (3) advertising and promotion for a new location. The Rejection Claimants also seek return of their security deposit and attorneys' fees. Some of the Rejection Claimants sought other damages, e.g., franchise fees, lost profits, etc., particular to their situations.

Garvey Court's position is that the Rejection Claimants cannot recover any damages because of their failure to pay rent and the resulting termination of the leases on account of such defaults. Alternatively, Garvey Court argues that the Rejection Claimants are seeking to reap a windfall from the rejection of their leases, but the Rejection Claimants' actual damages must be determined based upon the language in the Rejected Leases and applicable state law, in this case Illinois. Generally, Garvey Court argues that by operation of the two-year early termination option provision in the Rejected Leases ("Kick-Out Clause"), all Rejection Damages should be limited to two years. Specifically, Garvey Court argues that: (a) most of the Rejection Claimants seeking replacement rent are not entitled to any amount because the market rate is lower than what they are currently paying; (b) the new build-out costs must be prorated over the useful life of the leased premises; (c) Rejection Claimants cannot seek build-out costs at both the

Food Court location and a new location; (d) the security deposits should not be returned, but should be applied to unpaid rent, and any rejection damages should be reduced by the unpaid rent; (e) the Rejection Claimants are not entitled to recover attorneys' fees, because there is no provision for such in the Lease or under any provision of law; and (f) Rejection Claimants seeking lost profits made little or no profit during the preceding year(s).

### A. Expert Testimony of Mr. Gary DeClark

Garvey Court called as its real estate expert witness Mr. Gary K. DeClark, a Senior Vice President of CBRE, Inc., who testified with respect to two issues: (a) the fair market rental value of replacement space; and (b) build-out costs, the two categories composing the major portion of the rejection damages sought. CBRE, Inc. is a real estate valuation and advisory service group in Chicago. Mr. DeClark stated that he was hired to "study replacement rent and also alternate leasehold improvement costs, both over a 24-month period," as of May 1, 2015.

#### 1. Fair Market Rental for Replacement Space

Mr. DeClark provided a general analysis of the Food Court based on a cursory inspection of it and the exterior of the tenants' properties[6] (to determine age, condition, quality, exposure, appeal, etc.) and the comparable rental restaurant properties he selected to use as the basis upon which he made his estimates as to the fair rental value or fair market value of the rent of properties in an alternate location. He also provided an assessment of the properties selected by the Rejection Claimants as potential replacement properties.

In determining the fair market rental for new locations, Mr. DeClark testified that he reduced an initially large group of potential comparable rentals he selected down to a series of eleven currently rented comparables, ten of which were food courts, he believed to be most indicative of what the rental property value should be, based on location, quality of space, and the leasees' term. He then narrowed the comparables to those seven ground-floor leased spaces similar to the Food Court spaces and, based on his judgment call, made an adjustment to the

---

[6] Mr. DeClark testified that he did not go behind the counters of the tenants' premises.

actual gross rental rate per square foot for size to indicate an adjusted market rent per square foot.

Finally, Mr. DeClark testified that he looked at the rent under the existing lease at 201 N. Clark over a period of 24 months, and compared that to what his estimate of market rent would be for comparable space over a 24-month time frame. As a result of his analysis, the net market rent was greater than the current lease for only three of the nine Rejection Claimants' spaces.

### 2. Build-Out Costs

Mr. DeClark testified that he created a Summary of Claim New Leasehold Improvements to summarize his estimated cost of leasehold improvements for each Rejection Claimant over a two-year period under the Kick-Out Clause ("Kick-Out Period"). First, he started with the presumption that the useful life of leasehold improvements is 15 years based on a declaration by the Internal Revenue Service and discussions with real estate brokers. He calculated the cost of leasehold improvements claimed by the Rejection Claimants for the Kick-Out Period by prorating the claimed amount over the average life of the build-out for two years (i.e., multiplied the amount by 2/15).

Next, Mr. DeClark testified that he used the Marshall Valuation Service Calculator Method chart, which specifies the cost per square foot to construct leasehold improvements for fast food restaurants, as one indicator to determine that the reasonable square footage build-out cost for a property comparable to the Food Court (best described as a Class C average-type quality of construction, in average condition) would be $128.57. He also testified that he talked to people, including other brokers, over the course of his investigation that gave him a range of $100 to $150 per square foot as reasonable, which he said he used as another indicator in his calculations. Yet, when asked why the "CBRE Corrected Per Square Foot" column does not reflect the $128.57 figure, but amounts between $100 and $125, Mr. DeClark simply responded "that's my judgment call" as to what the reasonable cost would be to replace the 201 N. Clark property in the condition on May 1 into another location. Mr. DeClark further explained that in his opinion, none of the current tenant locations were "quite equal to a Class C average finish"

-7-

and were "not as good as what Marshall suggests . . . I think it's less." Mr. DeClark then testified that he multiplied the "CBRE Corrected Per Square Foot" figures by the square footage of each Rejection Claimant's space to determine the total CBRE Estimated Leasehold Improvements and again applied the 2/15th ratio to calculate the "CBRE Estimated Cost of Leasehold Improvements Allocated 24 Month Share of Useful Life" amounts.

On cross-examination, Mr. DeClark admitted that he may have only glanced at, but did not consider, the supporting detail and documents attached to the Rejection Claimant's proofs of claim. He testified that, although he had categorized the property at 201 N. Clark as a Class C average-type property, based on his discussions with various brokers and his experience as a broker and former restaurant owner, he applied another discount (over 20% in some cases) to derive the CBRE Corrected Per Square Foot amounts used in his calculations.

### 3.     DeClark Credibility Limited

Although the Court was satisfied with Mr. DeClark's credentials as a real estate broker and appraiser of commercial properties enough to certify him as an expert, the Court cannot give much weight to his testimony given the involvement of his employer in this matter and the quality of his testimony. Mr. DeClark is currently a Senior Vice President of CBRE Group, which was the management company that operated the property at 201 N. Clark for Debtor Dearborn Retail for a period of time. On cross-examination, he testified that he was unaware of that fact, learned of it at his deposition herein, was not personally involved with the management of 201 N. Clark and did not say when that engagement ended.

Mr. DeClark further testified that he was one of two senior vice presidents of CBRE on the appraiser side of the business and, according to CBRE rules, prior to accepting the engagement as an expert witness, he sent out a conflicts check to all of the major divisions at CBRE, which came back negative, even though CBRE had managed the property at 201 N. Clark within the last two or three years. He stated that had the conflicts check come back that anyone at CBRE was involved with the property, he would not have proceeded in this matter.

However, Mr. DeClark could not explain the conflict and why it was not discovered before his deposition.

Also, in discussing his selection and use of the food court at Northwestern Hospital as a comparable location, Mr. DeClark appeared confused as to what area of the City of Chicago the Hospital was located, referring to it as River North, rather than Streeterville. Likewise, on cross-examination, Mr. DeClark testified that the food court in the Thompson Center/State of Illinois building is on the street level, when the food court is actually on the lower concourse level of the building, which requires use of the down escalator upon entering the building at street level or the use a pedway/tunnel to access its food court.

Finally, Mr. DeClark did not cite or present any learned treatises to otherwise support his methodology for determining reasonable build-out costs and replacement rent. He simply relied on his judgment and conversations with other brokers in the selection of the property comparables, making the numerous adjustments and performing the various calculations.

### B.     Good Faith & Fair Dealing

In the cases of some of the Rejection Claimants, Garvey Court's actions violated the implied covenant of good faith and fair dealing under Illinois law. Illinois law recognizes that all contracts carry an implied duty of good faith and fair dealing. *Martindell v. Lake Shore Nat'l Bank*, 15 Ill. 2d 272, 286, 154 N.E.2d 683, 690 (Ill. 1958). "[T]his obligation requires a party vested with contractual discretion to exercise it reasonably, and further he may not do so arbitrarily, capriciously, or in a manner inconsistent with reasonable expectations of parties." *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 131, 894 N.E.2d 781, 793, 323 Ill. Dec. 755 (Ill. App. Ct. 2008). The implied covenant of good faith has been interpreted as a "promise to do nothing which will destroy or injure the other party's right to receive the fruits of the contract." *See Coleman v. Madison Two Assocs.*, 307 Ill. App. 3d 570, 580, 718 N.E. 2d 668, 676, 241 Ill. Dec. 97 (Ill. 1999); *see also Tilstra v. BouMatic LLC*, 2015 WL 3953403, *3 (June 30, 2015, 7th Cir.) ("contract law imposes on both parties to a contract a duty of good faith in the performance of the contractual obligations" (citation omitted)). A breach of the duty of good faith and fair dealing is a breach of contract.

Notably, Dearborn Retail and certain of its affiliates each filed voluntary petitions on August 19, 2013 and August 28, 2013. Although none of the parties brought up the good faith and fair dealing requirement, the timing of Dearborn Retail's bankruptcy filing and the execution of many of the leases led the Court to consider the fact that six of the nine Rejection Claimants entered into their leases after Dearborn Retail filed for bankruptcy—K-Kitchen (August 29, 2013, five-year term); Seedays (October 2, 2013; five-year term); Pueblo (October 18, 2013; five-year term); Wing Kingz (November 18, 2013; five-year term with option for five more years); Harold's Chicken (March 24, 2014; five-year term); and Robinson's Ribs (March 25, 2014; five-year term). All of the Rejection Claimants entered into a lease with Dearborn Retail less than two years before Dearborn Retail filed to reject their leases on May 12, 2014, some with eight to eighteen years remaining on their leases.

The most egregious example of Dearborn Retail and Garvey Court's bad faith in dealing with the Rejection Claimants is with the owner of Robinson #1 Ribs. Dearborn Retail entered into that lease on March 25, 2014, with a stated five-year term, the day before Dearborn Retail actually entered into the commitment letter for the Bighorn Transaction. Dearborn Retail was undoubtedly in negotiations with Bighorn prior to entering into the Bighorn commitment letter on March 26, 2014.

Mr. Mark Goldstein testified that he was involved on both sides of the Bighorn Transaction. He was the Chief Financial Officer of American Invsco Companies ("American Invsco"), which owned Dearborn Retail, and he operated the property at 201 N. Clark for American Invsco pre-petition. He is currently the Chief Operating Officer of Bighorn, which, through agreements, is the ultimate owner of Garvey Court, and is in charge of obtaining zoning for the new development at 201 N. Clark. Mr. Goldstein further testified that Bighorn is a developer and from the beginning the plan in acquiring the property at 201 N. Clark was to "tear down the building, develop the property, and build an 83-story high-rise, including 600 hotels [sic] and 300 apartments." Finally, Mr. Goldstein testified that, as CFO of American Invsco, he made the decision to reject the leases and that no one ever gave formal notice to terminate the leases pursuant to the leases' terms to the Rejection Claimants.

Indeed, Mr. Goldstein testified that Garvey Court offered new two-year leases with a shorter 30-day cancellation period, rather than give the two-year termination notice, because it wanted the ability, once the project received zoning approval, to give short notice to the Food Court tenants to leave even earlier.[7] Yet, on March 25, 2014, Dearborn Retail entered into a five-year lease with Windy City Finest, with a term to begin May 1, 2014, knowing that they intended to kick out the Food Court tenants and tear down the building as soon as they could get zoning approval.[8] Mr. Ron Boyd of Robinson's Ribs testified that he received notice of termination of his lease around May 30, 2014, less than a month after the lease term began. Robinson's Ribs eventually moved its business out of the Food Court in mid-December 2014.

### C. Application of Section 365(g) of the Bankruptcy Code.

Garvey Court generally wishes to limit the rejection damages awarded to the Rejection Claimants to only two years under the early termination clauses of the Rejected Leases. However, this matter does not cover damages pursuant to that clause, as it was never triggered. This is a case of damages from a breach of contract as a result of the rejection of a lease under bankruptcy law. Under section 365(g), the Rejection Claimants are entitled to any damages fairly and reasonably determined to be naturally arising from the breach or reasonably within the contemplation of the parties as a probable result of a breach. After rejection, the following damages, among others, absent a valid agreement as to the measure of damages, may include: (1) reasonable pre-rejection tenant expenditures which Dearborn Retail at the time the lease was made could reasonably have foreseen would be made; (3) reasonable relocation costs; (4) loss of anticipated business profits proven to a reasonable degree of certainty. *See Restatement (Second) of Property* § 10.2 (1977).

---

[7] Although the Rejected Tenants implied that Garvey Court attempted to constructively evict them by turning off the heat and water in the winter of 2014/2015, they did not present any evidence to prove such intent and rebut Garvey Court's testimony that the heat issue was caused by third parties, which they did their best to resolve in a timely manner, and they were never notified of or had any knowledge of any water, frozen pipe or sewage issues.

[8] Dearborn also entered into another lease on March 24, 2014 with LaTanya Winfield d/b/a Harold's Chicken Shack #84, although she has settled with Garvey Court on her proof of claim.

The Rejection Claimants have to move and find other locations for their businesses directly as a result of Dearborn Retail's rejection of the Food Court lease. This should have been reasonably within the contemplation of Dearborn Retail as a probable result of its breach.[9] But for such rejection, the Rejection Claimants could not have left 201 N. Clark and could have remained for the remainder of their leases. The Court finds that the Rejection Claimants provided sufficient evidence that they engaged in a thorough search for comparable locations and obtained reasonable estimates as to actual necessary build-out costs and moving costs to support their claims for replacement rent for the remainder of their Rejected Leases, build-out costs at a new location and moving costs. The Court also finds that it was foreseeable at the time of entering into the Rejected Leases that the Rejection Claimants would have to make leasehold improvements to the premises in the Food Court to tailor the spaces to operate their businesses. The damages being sought herein are reasonable given that all of the Rejection Claimants entered into their leases less than two years before Dearborn Retail rejected them.

However, the Court finds that the Rejection Claimants have not sufficiently proven that claims for losses due to "downtime", "ramp-up", "time expended" and retraining of employees reasonably arises from the rejection or was contemplated by the parties as a probable result thereof. Also, the Rejection Claimants are responsible for the payment of rent for any period in which they remained on the property after rejection of their lease. Therefore, any security deposit held by Garvey Court first shall be applied to any unpaid rent; any remaining security deposit after such application shall be returned to the Rejection Claimants.

Finally, under the American Rule each party pays its own attorney fees unless otherwise set forth in a statute or an enforceable contract; neither exception applies here. *See Travelers Casualty & Surety Company of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 448 (2007).

## IV.    Conclusion

---

[9] *See Restatement (Second) of Property* § 10.2 cmt. d (1977).

For the reasons noted herein, the Court finds that Garvey Court, LLC and Garvey Court Holdings, LLC are liable to each Rejection Claimant for rejection damages in the form of the following: (1) any amounts needed to build out a new location; (2) a prorated amount of the build-out costs incurred at the Food Court for the remaining term of the Rejected Lease; (3) any removal and relocation of equipment and assets to a new location; (4) reasonable marketing and advertising at a new location; (5) replacement rent differential for the remaining term of the Rejected Lease; and (6) any proven lost profits. Any unreturned security deposits will be applied to any unpaid rent during the months in which the Rejection Claimants remained at the Food Court; any remainder will be returned. There will be no amount allowed for "downtime", "ramp-up", "time expended" or retraining claimed by the Rejection Claimants. Finally, no claim for attorneys' fees will be allowed.

Accordingly, the Proofs of Claim filed by each Rejection Claimant is allowed as set forth in the Orders.

This constitutes the Court's findings of fact and conclusions of law. The Court will issue a separate judgment order consistent with this opinion outlining the amount of rejection damages allowed for each Rejection Claimant.

Dated: July 14, 2015

ENTER:

*Jacqueline P. Cox*

Jacqueline P. Cox
U.S. Bankruptcy Judge